Okay, the clerk may call the next and final case for the morning. This is a measure of 3.195. Robert Underhill et al. v. Huntington National Bank. Court will argue the matter for three fifteen minutes for five. Mr. Blunt, please proceed to comment. Thank you. Okay, please the court. I'd like to reserve three minutes for rebuttal. Fine. I'm asking that this court reverse the decisions below and remand this case with instructions to deny the motion to remand. The focus of the decisions below has been whether Gulf Sheik's legal claims gave rise to a pre-petition property interest of the debtors. But there are two other jurisdictional issues that dispose of this case. First, on May 19, 2010, the Underhill's debts were discharged. They were wiped away. Under 11 U.S.C. 524, this discharge prevents any, quote, act to collect, recover, or offset any such debt as a personal liability of the debtor, end quote. Huntington's claims, as well as the claims of the other creditors, have been discharged. So, to collect or recover... So, even though there's a discharge order that's entered, as you properly cite Section 524, what's the effect of Section 350 that reopens that bankruptcy of debt? The cases have talked about reopening a bankruptcy as a ministerial act, and it's a necessary first step. Huntington, in its motion to reopen, recognizes this, and the last sentence of their motion to reopen is as follows. Huntington has notified the United States Trustee's Office, via service of this motion, that the events detailed above may give rise to revocation of debtors' discharge. For them to collect or recover, that revocation is necessary. But if the bankruptcy court could not administer assets and make further determinations, the reopening would be simply a perfunctory useless act. I mean, if a bankruptcy estate is reopened, for example, to recover preferences, to recover fraudulent transfers, to do a number of things, and they couldn't do anything with things that have been discharged, wouldn't that give debtors and other creditors a windfall and penalize creditors who would have their debts either partially discharged? Well, now there's more assets to be administered? That argument seems to me to be illogical. Well, I think 727E allows a one-year period for that discharge to be revoked. So there is some finality to the bankruptcy case, and 727E says that's one year after either the date of discharge or the date of closing of the bankruptcy. And so under 727, what are the grounds for which a discharge could be revoked? Because revocation and this reopening for administration go at two different things, in my estimation. Okay. I think for any substantive relief to be granted to Huntington, though, I believe a revocation is necessary. And so D1 and 2 of Section 127 talk about the grounds, and D states that the court shall revoke a discharge granted under subsection A if, one, such discharge was obtained through fraud of the debtor and the requesting party did not know of such fraud until after the granting of such discharge, or two, the debtor acquired property that is property of the estate or became entitled to acquire property that would be property of the estate and knowingly and fraudulently failed to report the acquisition of or entitlement to such property or to deliver or surrender such property to the estate. That's two, and D2 states that it's a one-year period from the latter of the date of granting of the discharge or the date the bankruptcy is closed. So even in the case where there is, say, a partial discharge, the bankruptcy would not be closed, and it would be a one-year period from the latter date of closing of the bankruptcy. Second, Ohio law states that a membership interest in an LLC does not confer upon the member any specific interest in the company property. Such law is instead held and owned solely by the company. That's from the U.S. Bankruptcy Court for the Northern District of Ohio in N. Ray Nevin slash Kara Leiber. It's 2012 Bankruptcy Lexus 2244, and it's quoting 1705.34, Ohio revised code. And Ohio revised code 1705.17 states that a membership interest in an LLC is personal property of that member. So here, the Underhills are the debtors, and they listed their membership interest in Gulf Chic in their bankruptcy schedule. So even if the claims of Gulf Chic existed at the time of the petition, which we of course admit they did not, they wouldn't have to separately list the assets of the LLC. That is the property of the LLC. But the bankruptcy code under Section 541 says that any interest in any property, anywhere, wherever located, becomes property of the Section 541 bankruptcy estate, correct? That's correct. It could be unliquidated. It doesn't have to be a finite thing at that point. Right, right. There's no question that the personal property, that the property, their interest in Gulf Chic was property that they should have listed and fell under the jurisdiction of the bankruptcy court. And so any interest in any potential litigation, any legal action, any of that would also be property of that estate, would it not? It would be part of their membership interest. If they owned, I know this is on the far end of the hypothetical range, but if they owned stock in P&G, they wouldn't have to separately list legal claims that P&G owned. They would only have to list those shares. But if they had an action for some reason against P&G that might potentially result in some kind of recovery, wouldn't they have to list that? They would if they individually had that action. They would have to separately list it in addition to any ownership of the company. The courts below conflated the underhills in their company, which runs contrary to this 1705.34 Ohio Revised Code. So finally, I'd like to turn to whether Gulf Chic's disposition here emphasizes the importance of the fresh start. Right. I mean, that's really what's, that's the overall policy situation that we have here. Correct. And this result emphasizes the importance of the fresh start. Correct. And when you're looking at whether a legal claim existed, 541 has a temporal analysis. It says as of the commencement of the case. And so here we look at January 6th, 2010, which is the date the underhills, the debtors filed their bankruptcy petition. And as of that date, they didn't have any property interest in any claim. Tyler, a recent decision by this court. I thought they had, okay, so on October 25th, 2010, Gulf Chic had sued the Ladies' Pro Shop. That was in 2000. They had sued the Ladies' Pro Shop and the state court, alleging claims of tortious interference with business relationships that stemmed from conduct in 2009, which is pre-petition conduct. To analyze that, we have to look at the underlying substantive law. And here, Ohio tortious interference has five claims, five elements, I'm sorry. The first element is the existence of a contract. Here, Gulf Chic Boutique was formed in 2006 and had a business relationship with its supplier that went back to 2007. And so that satisfies the first element. The second element is the wrongdoer's knowledge of that contract. And the evidence and testimony below show that Ladies' Pro Shop and the Florida defendants knew of Gulf Chic and knew of its relationship with Jamie Sadock in 2009, which was pre-petition. So those are two of the five elements. The third element is the wrongdoer's intentional procurement of the contract's breach. And that didn't happen until September 30th, 2010. That's almost ten months after the bankruptcy petition was filed. The fourth element is lack of justification, and the fifth element is resulting damages. So those three elements didn't occur until September 30th, 2010. And in line with Tyler, which is in line with the Siegel language, background facts or conduct can't root a claim in the pre-bankruptcy path. There has to be a pre-bankruptcy violation. Here, there was no violation. When you look at what happened pre-bankruptcy, it was... I'm sorry. Why are you looking for that? You also talked, I believe, about trustee abandonment as a further basis for why you should fail. Talk about that a little bit. Right. That's based in the claim that the debtors didn't have an obligation to separately list their membership in the company and the legal claim, which was an asset of the company. They weren't parties to the legal claim. The legal claim was asserted by Golf Chic Boutique. So when they listed their and scheduled their interest in Golf Chic Boutique LLC, and the trustee did not dispose of that asset, and under Section 544, the case was closed and it wasn't disposed of, that was abandoned. And even if their valuation of the company was wrong, they said it was worth $0. If that was wrong, it can't later be unabandoned. So that goes along with whether they had an obligation to separately schedule the lawsuit as an asset. And I submit they didn't. So in 2009, Golf Chic existed. They had a contract with Jamie Sadock. There was the existence of the Florida Defendants. The Florida Defendants learned about Golf Chic and looked at their website and pricing information, and they formed Anonymous. When you look at the documentation, the Florida Defendants didn't even start making complaints to the supplier until the first documented complaint we have is January 12th, which is after the petition was filed. But even those complaints don't give rise to a violation. The violation is the intentional procurement of that contract's breach, which happened about 10 months later on September 30th, 2010. I'm short on time, so I'll reserve the rest for Robyn. Thank you. Good morning. May it please the Court. Counsel. My name is Jody Oster. I represent Huntington National Bank. I'd like to touch on something that Judge Merritt talked about, which is the debtor's fresh start. That fresh start is not something that is automatically given to debtors in bankruptcy. The fresh start in the discharge presumes that a debtor has come to the court and fully disclosed all of its assets and property and all of its legal and equitable interests under Section 541. That is not something that happened here. The debtors here did not disclose that they had a legal claim in interest against the Florida defendants, against Ladies Pro, against Andrea Walsh, and others. They did not disclose that. And, in fact, the testimony, their own testimony, in the Hamilton County action reflected that they knew that the claim existed. They knew that Ladies Pro had disparaged them in 2009 and had contacted Jamie Sadduck at that time. Those events gave rise to the claim and were specifically referenced in the complaint. There was no termination of the contract that was necessary in order for those claims to arise, for a tortious interference claim to arise. In fact, it was the disparagement that occurred in 2009. And from the lips of the debtor, Beth Underhill, that's when it began. She outlined in the Hamilton County action that there were other events that occurred in 2009, including an email that was sent to Jamie Sadduck that, in fact, indicated that the Ladies Pro shop wanted Sadduck to stop doing business with Golf Chic because Golf Chic was undercutting the prices. Golf Chic was selling merchandise cheaper than Ladies Pro shop was. So, it is wrong to assume... If I ask counsel, would you address the counter-argument that the debtor's counsel just advanced, that the feature of intentional procurement of the breach was post-petition? Your Honor, I don't believe that the testimony is consistent with that proposition. I think that the evidence, again, from the debtor's own lips and also from the testimony, the deposition testimony of Andrea Walsh, the owner of Ladies Pro, was that that action, that activity, actually started in 2009. But counsel tells us, and so I hope you'll respond, that that doesn't pre-petition or during the bankruptcy pre-petition activity, forming the animus, et cetera, does not root the claim. That is not what Siegel v. Rochelle says, Your Honor. Siegel v. Rochelle says that there are events, that events that occur pre-petition can form the basis for the claim being property of the estate. It may happen that there are events that occur post-petition that also form the basis for the claim. And the mere fact that the events straddle the petition date, the bankruptcy petition date, doesn't mean that the property is not property, that the claims are not property of the bankruptcy estate. I think that that is very clear from Siegel v. Rochelle, that the events can straddle the filing. I think originally when this case began, the argument or the theory that was advanced by the Underhills was that they didn't know about the claim when the bankruptcy petition was filed. And in fact, I think that the testimony reflected that they did, that their deposition testimony reflected that that was not the case. Mr. Blessings would have us believe that even if all the things that you say are correct, that you still lose because you're beyond the year, and so jurisdictionally you're barred. How do you respond to that? The action that Huntington brought was to move to reopen the case to administer assets that had not been disclosed. That action is not tantamount to a revocation of the discharge. Isn't there interplay between 724, 7, and 350? Reopening the bankruptcy case to administer an asset merely permits the asset to be brought into the bankruptcy estate for the trustee to collect it, to reduce it to value, and to distribute it to the creditors based on a determination of the priorities or the pro rata interest of the creditors. Does that give you a fresh clock? No, it does not give a fresh clock. And in fact, Huntington has not asked that the discharge be revoked. That is something that would have to have been done by a separate adversary proceeding filed in the bankruptcy case if that was to occur. The important part about the asset, though, Your Honor, is that these were not just any assets or claims. These claims were secured to Huntington. These claims were pledged as collateral for a loan that was made by Huntington pre-petition to Golf Chic that was guaranteed by Beth Underhill. So you're arguing that it would be inequitable for, at this point, the Underhills to keep the settlement because that would constitute a windfall, an unfair windfall that would really be inconsistent with the distribution rules of bankruptcy and the fresh start. I think that is an undercurrent of this case, Your Honor. But I think the primary point is that they did not schedule this asset. Therefore, it was not administered by the trustee. It was not abandoned. It was not made free of Huntington's claims to it. It passed through the bankruptcy unaffected because it was not disclosed and it was not administered. I've been a bankruptcy practitioner for more than 20 years, and I've never heard anyone argue that an asset that is not scheduled can be abandoned like that. I've never heard that argument in all the years that I've been practicing. And it's very clear from the bankruptcy schedule and the petition that that claim was not disclosed. The Underhills disclosed all of the debts of Golf Chic as if to ask that they receive a discharge from those business debts. And they should have disclosed all of the assets of Golf Chic if that's in fact what they wanted was a discharge of all of the debts that were owed. How does the Ohio statutory law that counsel quoted to us affect your argument and position? Yes, you're talking about Chapter 1705, which essentially says that the individuals don't actually possess the right. There's case law that we cited in our brief, the Albright and Molodano case, which indicate that when a debtor has an ownership interest in an LLC, in a limited liability company, that at filing, that ownership interest becomes the property of the estate and the trustee steps into the debtor's shoes and is to administer any property that belongs to the LLC, any claims that belong to the LLC. That also should have happened here. And Harold Jernicki, the Chapter 7 trustee in this case, was never disclosed to him that this claim existed. And it's not in the record and it's not before this court, but certainly if it had been disclosed to him, he would have pursued it, he would have been able to reduce it to money for the benefit of the creditors and to distribute to the creditors. But he would also have had to have paid Huntington's claim before distributing any excess sums to any of the other general creditors of the Underhill Bankruptcy Estate. It would have required an adversary proceeding, would it not, Counsel, since it was a claim that hadn't yet been developed and didn't exist? Yes, Your Honor. The timing, this way the bank avoids the time bar by seeking reopening rather than beyond the one year deadline that would have existed but for the choice of reopening rather than opposing the discharger asking to vacate the discharge. The time bar that I believe you're referring to is the time bar to revoke the debtor's discharge and that is not something that Huntington has requested in this case. In the motion to reopen, there was no time bar and that is something that Huntington did, was request that the case be reopened to administer this asset. The bank is not seeking and has not sought to pursue the Underhills personally for collection of the Gulf Sheik debt. It's merely sought to reopen the bankruptcy case to bring the proceeds from the settlement into the bankruptcy estate so that they can be distributed to the creditors, secured creditors and unsecured creditors. There is no time bar on that. I realize that. I was analogizing to the otherwise would have been necessary post-petition. I guess reopening avoids the one-year time bar that otherwise would have existed. It's not an either-or proposition. It's not, you know, the different vehicle. I realize that. Okay. I think your time's probably expired. I can't see the clock and I'm sorry about that. I'd be happy to answer any other questions the court may have. No. Judge Merritt. Thank you. Thank you very much, Counsel. Mr. Blessing. Thank you, Your Honors. Reopening a bankruptcy case, the courts have held, is of no independent legal significance or consequence. And reopening is, quote, merely a ministerial or mechanical act which allows the court file to be retrieved from the stacks of the closed cases to enable the court to receive a new request for relief. And that case is Henry Pope, 2004, Bankruptcy Lexus 778. It's from a bankruptcy court from Nebraska. How does that help you? Because reopening isn't requesting the substantive relief. To request substantive relief, they have to- They have to obtain relief, the relief here, to administer an asset for the benefit of creditors. I'm not sure that that case helps you at all. My argument is that they are not- they can't be paid on their debts when their debts have been discharged. They have to revoke their discharge before they can recover on their debts from the underhills. The discharge, though, is a benefit for a debtor. And as Counsel said, under the distribution scheme of the bankruptcy court, the assets are administered for the benefit of creditors. And in the end, the creditor gets the fresh start after the distribution has occurred. And here, her argument is that this asset was never administered for the benefit of creditors. But just because the debtor has gotten a discharge, the debtor is not entitled under the fresh start principles of bankruptcy to simply get a windfall by not disclosing and not having that asset administered and not having the trustee perform their statutory duties. Correct. Golf Chic was administered. And we don't have the transcript of the 341 meeting for creditors in the record here. But Mr. Jarnicke determined not to liquidate it. He had the power to do so. Now, that's even ignoring the fact that the claims didn't exist at the time. And this court in Tyler, in just November, established the principles here for an unliquidated claim and a bankruptcy declaration. They say the property interest has to exist at the time of the petition and to determine that, you should look at underlying state law. And simply background facts or conduct doesn't root a claim in the pre-bankruptcy path. There has to be a violation. You heard opposing counsel absolutely disagree with your statement. Yes. I can speak to that. There was a comment in the deposition of Beth Underhill. And the question was, when did she learn of the acts of defendants? She answered April of 2009. It wasn't specific. And there wasn't further questioning to find out what she learned and when she learned it. But when we look at the documentary evidence below, the complaints from the Florida defendants to the supplier, and I see my time is up and I'll just finish this point. The documentation shows that the complaints didn't start until January 12th of 2010. That is after the bankruptcy petition is filed. And it's my proposition that the procurement of the breach is the necessary element here. And that didn't exist until September 30th of 2010. Okay. Thank you very much. Thank you. The matter is submitted. We thank you for your argument. The clerk may now adjourn court.